*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KADE KRISTON PERRIGO,

Defendant-Appellant.

UNPUBLISHED
January 18, 2024

No. 360567
Kent Circuit Court
LC No. 19-006265-FH

Before: GLEICHER, P.J., and BORRELLO and SHAPIRO, JJ.

PER CURIAM.

A jury convicted Kade Kriston Perrigo of one count of first-degree criminal sexual conduct (CSC-I) in violation of MCL 750.520b(2)(b) (sexual penetration of a victim under the age of 13 by person over the age of 17) for digitally penetrating the then-nine-year-old daughter of his live-in girlfriend. The jury acquitted Perrigo of a second-degree criminal sexual conduct charge (CSC-II). Perrigo's trial was riddled with error, the cumulative effect of which denied Perrigo a fair trial. We vacate Perrigo's conviction and sentence and remand for further proceedings.

## I. BACKGROUND

In 2019, 15-year-old ARW disclosed to a school counselor that six years earlier, when she was nine, she fell asleep on the living-room couch and awoke to find Perrigo's "hands . . . in her pants." ARW described that she then got up and went to her bedroom. Perrigo, ARW's mother's boyfriend, still lived in the home when ARW made the 2019 report. At trial, ARW testified she was not certain whether Perrigo digitally penetrated her vagina or just touched the outside of her vaginal area. She testified "it hurt a little," but given her young age and the trauma she experienced, she could not "say for sure" whether penetration occurred.

After making her report to the school counselor, ARW participated in a forensic interview. A portion of that interview was played during ARW's testimony at the 2021 trial for "identification purposes." After asking a few more questions, the prosecutor sought to admit another portion of the recorded interview. Defense counsel objected because ARW had not "testified to anything that she doesn't remember," making the prosecutor's purpose for admission "improper." The court rephrased the objection as "one of relevance or duplicity" and asked for the prosecutor's response.

-1-

The prosecutor explained: "Part of it is a consistent statement, but also part of it is to show her demeanor at the time, . . . also to corroborate, you know, what she's saying today with what she said back then." The prosecutor referred to defense counsel's claim in opening statement that ARW could not remember everything and the need to corroborate ARW's testimony with her earlier statements as a result. The prosecutor did not want to use the video to refresh ARW's memory, but as substantive evidence.

Defense counsel expanded her objection, citing MCL 600.2163a(8)(b). The court did not ultimately rely on this statute and we will not discuss the parties' arguments in this regard. The prosecutor changed tack and proposed to use the evidence for impeachment purposes. Specifically, the prosecutor asserted "there could be some impeachment because I believe that when she was interviewed and on this recording she does talk about more detail about the penetration part of things." The prosecutor wanted to show that portion of the recorded interview while ARW was on the stand to "impeach her." The court confirmed that the prosecutor wanted to impeach her own witness with a prior inconsistent statement. Ultimately, over defense counsel's strenuous objections, the trial court admitted the interview for the "limited purposes" of impeachment and to refresh ARW's recollection.

When ARW retook the stand, the prosecutor asked her to recall her statements during her forensic interview that Perrigo's "fingers entered your vagina." ARW remembered making that statement. The prosecutor then asked ARW to recall her earlier testimony that Perrigo may have touched only outside of her vagina. Defense counsel interrupted ARW's answer with a hearsay objection. The court indicated it would consider giving a limiting instruction at the end of the trial, but at that time would permit the testimony and the video "either as a means of impeachment or refreshment of the witness's recollection." Four minutes of video were shown before defense counsel objected again, contending, "None of this impeaches her testimony to this point[.]" The prosecutor retorted that the very next sentence in the recording reached the issue. The court overruled the objection and allowed another minute to play. During this portion of the video, ARW expressed that "I felt like he was trying to finger me."

On further questioning by the prosecutor, ARW continued to assert she could not remember if Perrigo's finger entered her vagina. And on cross-examination, ARW continued to admit she could not remember "because it was a traumatic experience for me." But she was "sure that it hurt." Defense counsel played another portion of the recorded forensic interview, after which ARW maintained that the abuse was painful.

After both sides finished questioning ARW, the court asked questions posed by the jurors, again over defense counsel's objection. The court inquired: "do you sometimes say 'I don't know' as a filler or because you don't want to say much . . . or does 'I don't know' when you say it, mean you really don't know anything about the question being asked?" This led to defense counsel playing another section of the forensic interview in which ARW used the phrase "I don't know." ARW asserted she stated "I don't know" as a filler phrase because she was nervous during the forensic interview, despite knowing the answer to the interviewer's questions. She testified that the statement "I don't know" was not equivalent to "I don't really remember," after the prosecution played yet another two-minute section of the video.

Before reporting the abuse to a school counselor, ARW had disclosed the event to several middle school friends. One of those friends—SDV—testified at trial that ARW told her that when she was nine years old, she was laying on either a bed or couch with Perrigo "and he touched her . . . in the private area." SDV understood this to mean "by her vagina." On cross-examination, SDV testified she knew ARW said Perrigo touched her "private area" but could not remember if ARW used the word "vagina" and did "remember it was underneath the clothes." SDV encouraged ARW to report the abuse. Upon questioning by the prosecutor, SDV testified ARW also disclosed her brother had sexually abused her around the same time. And on cross-examination, SDV claimed she witnessed Perrigo emotionally abuse ARW by calling her "stupid," throwing a towel at her, and "stuff like that."

Kent County Sheriff's Deputy Gary Vickery testified that he was present during ARW's forensic interview. After the interview, Deputy Vickery contacted Perrigo and he voluntarily appeared for an interview. Deputy Vickery testified that Perrigo did not emphatically deny the allegations, but rather stated: "I know in my heart I did not do this."

At the close of the prosecution's case-in-chief, Perrigo sought a directed verdict on the CSC-I charge because ARW testified Perrigo touched only the outside of her vaginal area and her statements about penetration at the forensic interview could only be used for impeachment purposes. Perrigo also sought a directed verdict on the CSC-II charge, claiming ARW testified she believed Perrigo was asleep as they lay on the couch. If Perrigo was asleep, he could not have intent, the defense argued. The court took the motions under advisement.

The next day, the parties reconvened for a final argument on the admissibility of ARW's recorded forensic interview. The court ultimately ruled the recording was admissible as substantive evidence (1) under MRE 613(b) as extrinsic evidence of a prior inconsistent statement because ARW was provided an opportunity to explain her statements, and defense counsel was able to cross-examine her, and (2) pursuant to MRE 803(5) as a recorded recollection because ARW recalled participating in the forensic interview and admitted that her present memory of the underlying incident was inferior when compared to the forensic interview.

The defense presented no witnesses and the parties proceeded to discuss the jury instructions. The written jury instructions delineated the elements of the charged offenses and both attorneys asserted the instructions appeared correct and complete. However, the court did not read the offense-element instructions to the jury. Instead, the court provided the written instructions for the jury to review in the jury room. Neither attorney objected and they both asserted they had no "concerns" with the instructions as given.

The jury convicted Perrigo of CSC-I, but acquitted him of CSC-II. The court then revisited Perrigo's directed verdict motions. Reiterating that ARW's recorded forensic interview was admissible for substantive purposes, the court found adequate evidence to support the CSC-I conviction and denied the motion.

Perrigo then filed a motion for a new trial or evidentiary hearing, contending he was denied his right to a fair trial when the court neglected to orally delineate the elements of CSC-I and CSC-II in the final jury instructions, and this failure amounted to a structural constitutional error that required reversal. Perrigo also asserted his counsel's failure to object constituted ineffective

assistance of counsel. The prosecutor retorted that the trial court's provision of written instructions regarding the offense elements sufficed to protect Perrigo's rights. The trial court admitted it had erred, but found the error nonstructural. It reasoned relief was not warranted because the jury clearly read the offense elements as it asked questions during deliberations about the legal definitions of words in the instructions. The court further noted Perrigo had waived any objection through his attorney's express approval of the instructions as given. Even if counsel's performance was ineffective, the court concluded, relief was not warranted as there was no indication the outcome of the proceeding was impacted.

Perrigo now appeals as of right.

## II. JURY INSTRUCTIONS

## A. PRESERVATION

Perrigo challenges the trial court's failure to orally instruct the jury about the elements of the charged offenses and contends his counsel was ineffective for failing to object and approving the instructions as given. Questions surrounding preservation of this issue are not straight forward. Defense counsel expressed satisfaction with the written jury instructions and did not object to the court's oral instructions. Defense counsel did not challenge the court's oral jury instructions until the posttrial motion for a new trial or evidentiary hearing.

A waiver is an "intentional relinquishment or abandonment of a known right." *People v Carines*, 460 Mich 750, 763 n 7; 597 NW2d 130 (1999) (quotation marks and citation omitted). There is an important distinction between an attorney's failure to object to a jury instruction and an attorney's express approval of the instruction. This distinction was clarified in *People v Carter*, 462 Mich 206, 216; 612 NW2d 144 (2000): "Defense counsel in the present case did not *fail to object*. Rather, counsel *expressly approved* the trial court's response and subsequent instruction. This constitutes a waiver that extinguishes any error. Thus, this case does not concern unpreserved error where no timely objection was made." In contrast, the codefendant's counsel in *Carter* failed to object to the challenged conduct, but did not "affirmatively approve[]" it. The Supreme Court highlighted that a failure to object is not the same as affirmative approval: "[C]ounsel's approval of the instruction did not preclude the court from reviewing a codefendant's challenge to the instruction. *Codefendant's counsel, rather than affirmatively approving the instruction, failed to object to the instruction*. The failure to object qualified as a forfeiture, and the court reviewed the instruction for plain error." *Id*. (emphasis added).

Here, the trial court neglected to ask the attorneys whether they had any objections to the jury instructions as read. The court instead inquired, "Counsel, is there anything we need to take up now that the jury is deliberating?" Both responded in the negative. This exchange does not reflect an "intentional" abandonment of a challenge to the oral jury instructions. Defense counsel did not affirmatively approve the jury instructions as read; rather, she failed to object to the court's oral instructions. This was a forfeiture, not a waiver.

Raising the instructional challenge in the motion for new trial did not preserve it. This Court has reached varying conclusions, albeit in unpublished caselaw, regarding whether a defendant adequately preserves an instructional issue if raised in a motion for a new trial. Those

finding appellate challenges preserved have noted this Court's holding in *People v Mayfield*, 221 Mich App 656, 660; 562 NW2d 272 (1997), that "[t]he purpose of the appellate preservation requirements is to induce litigants to do what they can in the trial court to prevent error and eliminate its prejudice, or to create a record of the error and its prejudice." The purpose of a timely objection is to allow the court to correct an error. When applied to the failure to read aloud pertinent jury instructions, the error cannot be cured by a motion for new trial, but could easily could have been cured by a contemporaneous objection. Accordingly, although not waived, Perrigo's challenge was also not preserved.

Perrigo did preserve his challenge to counsel's performance, however, by raising it in a trial court motion for a new trial or evidentiary hearing. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

## B. STANDARDS OF REVIEW

Generally, claims of instructional error are reviewed de novo. *People v Walker*, 504 Mich 267, 276; 934 NW2d 727 (2019). However, an unpreserved claim of instructional error is reviewed for plain error affecting the defendant's substantial rights. *Id*. To warrant relief, a plain error must have "resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity or public reputation of judicial proceedings." *Id*. Perrigo contends that the absence of oral instructions on the offense elements was structural error. Structural constitutional error requires automatic reversal. *People v Duncan*, 462 Mich 47, 51; 610 NW2d 551 (2000). For preserved nonstructural constitutional errors on appeal, the prosecution must prove that the error was harmless beyond a reasonable doubt. *Id*.

To establish the right to a new trial based on the ineffective assistance of counsel, a defendant must satisfy two components: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). To establish that counsel's performance was deficient, a defendant must show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms." *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). To establish prejudice, the defendant must demonstrate "a reasonable probability that, but for counsel's . . . errors," the result of the proceedings would have differed. *Id*. at 663-664.

## C. ANALYSIS

"A criminal defendant has a constitutional right to have a jury determine his or her guilt from its consideration of every essential element of the charged offense." *People v Kowalski*, 489 Mich 488, 501; 803 NW2d 200 (2011). "A court must properly instruct the jury so that the jury may correctly and intelligently decide the case." *People v Traver*, 502 Mich 23, 31; 917 NW2d 260 (2018) (cleaned up). "The instruction to the jury *must include all elements of the crime charged*, and must not exclude from the jury consideration material issues, defenses or theories if there is evidence to support them." *Id*. (quotation marks and citation omitted, emphasis added). The pertinent rule governing final jury instructions is now set forth in MCR 2.513(N), which was amended after our Supreme Court's decision in *Traver*, and provides, in relevant part:

(1) Before closing arguments, the court must give the parties a reasonable opportunity to submit written requests for jury instructions. . . . *After closing arguments are made or waived, the court must orally instruct the jury as required and appropriate, but at the discretion of the court, and on notice to the parties, the court may orally instruct the jury before the parties make closing arguments.* After jury deliberations begin, the court may give additional instructions that are appropriate.

\* \* \*

(3) Copies of Final Instructions. The court shall provide a written copy of the final jury instructions to take into the jury room for deliberation. Upon request by any juror, the court may provide additional copies as necessary. The court, in its discretion, also may provide the jury with a copy of electronically recorded instructions. [Emphasis added.]

Here, the prosecution and defense counsel had the opportunity to review the written jury instructions, which included the elements of the charged offenses. The jury entered the courtroom, the parties presented their closing arguments, and the court provided oral jury instructions. While the court verbally explained concepts related to the presumption of innocence, burden of proof, reasonable doubt standard, witness credibility, and legal definition of evidence, it failed to mention the individual elements of the charged offenses. It made no effort to draw the jurors' attention to those elements, either.

In *Duncan*, 462 Mich at 48, our Supreme Court determined, "It is structural error requiring automatic reversal to allow a jury to deliberate a criminal charge where there is a *complete* failure to instruct the jury regarding any of the elements necessary to determine if the prosecution has proven the charge beyond a reasonable doubt." (Emphasis added). In *Traver*, 502 Mich at 28-30, the Supreme Court examined a case in which the trial court failed to orally instruct the jury regarding the elements of the charges but provided the jury written instructions detailing the offense elements. The Court opined that MCR 2.512 and MCR 2.513 mandated that jury instructions be provided orally, but because defendant waived any claim of instructional error by approving the jury instructions as read, the matter did not warrant reversal. *Traver*, 502 Mich at 43. The *Traver* Court further clarified:

> We note that *Duncan*, 462 Mich at 57, which held that a trial court's complete failure to instruct the jury on the elements of the charged offenses constituted structural error requiring reversal, did not address the concept of waiver. However, because the instant case is distinguishable from *Duncan*, we need not address whether the complete failure to instruct would evade a waiver analysis. Unlike *Duncan*, the jury here received instructions in some form or another on the elements of *all* of the offenses—it is only the *manner* in which the instructions were presented that renders them imperfect. As with *Kowalski*, the claim of instructional error here did not amount to structural error—it is a nonstructural error and is clearly subject to a waiver analysis. [*Traver*, 502 Mich at 41 n 7.]

Here, too, the jury received instructions regarding the elements of the charged offenses in "some form or another," negating Perrigo's claim of structural error.

Although *automatic* reversal is not required, the trial court's error does warrant relief. Here, the trial court's failure to read aloud the elements of the charged offenses was plain error "seriously affect[ing] the fairness, integrity or public reputation of judicial proceedings independent of" Perrigo's innocence. *Carines*, 460 Mich at 763.

The only disputed issue at trial was whether Perrigo penetrated ARW's vagina. The evidence regarding this question was minimal, at best; a large measure was provided through the inadmissible forensic interview (an issue discussed later in this opinion). The jury evidently struggled with this issue, as reflected by its questions during deliberations regarding the legal definition of "genital opening," a term that would be been explicitly mentioned in the court's verbal instructions, and its request for an anatomical diagram of female genitalia. The written jury instructions delineated the elements of CSC-I and CSC-II, however, as highlighted in *Traver*:

> Logically, the jury must be cognizant of the final instructions at the point at which the invitation to clarify occurs, and the jury can only be cognizant of the instructions at that point—that is, when the court has concluded the final instructions—when the instructions have been orally communicated; jurors who still have to read a typed two-page statement after it is delivered to them will not be cognizant of the content of those instructions upon delivery. [*Traver*, 502 Mich at 36 (cleaned up).]

This Court in *People v Traver*, 316 Mich App 588; 894 NW2d 89 (2016), overruled in part on other grounds in *Traver*, 502 Mich at 23, highlighted the significance of oral jury instructions as follows:

> [S]ome jurors may not be able to read, or may read poorly. For those jurors, hearing instructions read aloud is the only method that ensures a measure of comprehension. Poorer readers may elect not to engage in the deliberations for fear that their comprehension may be called into question. Second, that a judge speaks the elements of an offense, in conjunction with the admonition that all must be proven beyond a reasonable doubt, communicates the gravity of the task of sitting in judgment. Handing jurors a few pieces of paper and telling them, in essence, to "make the best of it" sends a message that the legal "technicalities" are too unimportant to justify further expenditure of the court's time. [*Id*. at 599.]

Many courts have highlighted the importance of spoken jury instructions. The first one to do so was the United States Circuit Court of Appeals for the Third Circuit in *United States v Noble*, 155 F2d 315 (CA 2, 1946). In *Noble*, the trial court did not instruct the jury "as to the nature and elements of the [charged] offenses," and instead gave them a copy of the charging document, "the information." *Id*. at 316-317. The court rejected the prosecution's argument that the written document sufficed, holding it "essential" that the jury "be instructed upon the rules of law which they were to apply, the most fundamental and important of which were the essential elements of the crime charged." *Id*. at 318. The Court continued:

Moreover, we think that even if the information had contained a full recital of all the applicable legal principles the trial judge would not have fulfilled his duty in this regard merely by sending the information out with the jury to read if they chose to do so, during their deliberations. For not only are counsel and the defendant entitled to hear the instructions in order that they may, if they are incorrect, object to them and secure their prompt correction by the trial judge, but it is equally important to make as certain as may be that each member of the jury has actually received the instructions. It is therefore essential that all instructions to the jury be given by the trial judge orally in the presence of counsel and the defendant. We conclude that the failure in the present case to instruct the jury upon the elements of the crime was error. [*Id.*]

A number of courts have followed *Noble*. *Traver*, 502 Mich at 54-55 nn 6-8 (VIVIANO, J., concurring in part). Courts following *Noble* have pointed out that even when written instructions are provided "it is impossible to tell from the record whether the entire jury actually read all of the court's written instructions during its deliberations," *State v Iosefa*, 77 Hawaii 177, 184; 880 P2d 1224 (1994); see also *State v Lindsey*, 245 NJ Super 466, 474; 586 A2d 269, 274 (1991) ("We find the oral instructions to the jury totally inadequate in the circumstances and 'plain error' requiring a new trial. At the minimum, the *entire* instructions should be read to the jury. We cannot assume that each juror will independently read a written instruction or that a foreperson will read it to the entire jury in an objective fashion, as a judge would do. In this case, the jurors were not even specifically instructed to each read the instruction or to listen carefully while the foreperson read it. Nor will we even assume that each juror was sufficiently literate to read and comprehend the 'cut and paste' instruction.").[1] This Court, in an unpublished opinion, has made the same point: "A jury credibility determination made in a vacuum, untethered from the elements of the crime, is inadequate to ensure the fairness, integrity and reputation of the proceedings." *People v Vankersen*, unpublished per curium opinion of the Court of Appeals, issued June 30, 2022 (Docket No. 355659), p 3.[2]

The trial court's failure to orally instruct the jury regarding the elements of CSC-I and CSC-II "seriously affected the fairness, integrity or public reputation of judicial proceedings" because it is impossible to determine whether all of the jurors were aware of the distinctions between the two offenses, despite the juror questions. Further, the judge's error in failing to give the instructions orally was flagrant. The trial court violated the court rule, and ignored recent authority (*Traver*) condemning exactly what the trial court did. On this ground, the judge's failure to read aloud the instructions regarding the case elements seriously undermined the fairness of the proceedings. "[A]ssuring public awareness of the charge to the jury and promoting the dignity and formality of a critical stage of the criminal trial are among the underpinnings of the oral instruction requirement. These values rest on the very same concerns for the 'fairness, integrity,

---

[1] The judge had provided the jurors with a " 'cut and paste' sheet containing the definitions of the offenses and types or degrees of culpability." *State v Lindsey*, 245 NJ Super 466, 470; 586 A2d 269 (1991).

[2] Unpublished opinions of this Court are not binding precedent, but may be instructive or persuasive. *People v Manuel*, 319 Mich App 291, 301 n 4; 901 NW2d 118 (2017).

[and] public reputation of judicial proceedings' that comprise" the third plain error factor. *United States v Becerra*, 939 F3d 995, 1006 (CA 9, 2019).

The prejudicial effect of the inadequate jury instructions was compounded by defense counsel's errors. Defense counsel's failure to object to the final oral jury instructions was objectively unreasonable considering it is well established that courts are required to orally iterate the elements underlying the charges, and the jury's cognizance of that information was critical given the limited evidence presented regarding penetration. See *People v Yeager*, 511 Mich 478, 490; ___ NW2d ___ (2023) ("Trial counsel's failure to request a jury instruction may constitute an unreasonably deficient level of performance."); see also *People v Leffew*, 508 Mich 625, 646; 975 NW2d 896 (2022) ("[Defense counsels'] failures to request the defense-of-others instruction that supported their trial strategy was objectively unreasonable."). Regarding prejudice, a defendant is "not required to show that, but for counsel's deficient performance, he *would have been acquitted*. Rather, prejudice is established where a defendant shows that but for counsel's deficient performance, there is *a reasonable probability* that the outcome would have been different." *People v Heckaman*, ___ Mich ___, ___; 981 NW2d 495 (2022) (quotation marks and citation omitted). For the reasons explained above, Perrigo was prejudiced due to the trial court's omission of the CSC-I and CSC-II elements during its final oral jury instructions, which defense counsel had the opportunity to contemporaneously correct. Accordingly, defense counsel was constitutionally ineffective, prejudicing Perrigo and requiring relief.

### III. ADMISSION OF ARW'S RECORDED FORENSIC INTERVIEW

Perrigo continues to challenge the admission of portions of ARW's recorded forensic interview during ARW's live testimony. We agree the trial court erred. The trial court abused its discretion when it permitted the admission of excerpts of the victim's forensic interview because while extrinsic evidence of a prior inconsistent statement may be used to impeach, it cannot be used to prove the truth of the matter asserted unless it falls within a hearsay exception. The forensic interview recording did not qualify as a recorded recollection under MRE 803(5).

We review for an abuse of discretion a trial court's decision whether to admit evidence. *People v Thorpe*, 504 Mich 230, 251; 934 NW2d 693 (2019). We will not disturb that decision unless it falls outside the range of principled outcomes." *Id*. at 251-252 (quotation marks and citation omitted). "[I]f the issue is preserved, the defendant has the burden of establishing a miscarriage of justice under a 'more probable than not' standard." *Id*. at 252, citing MCL 769.26. "The reviewing court should reverse only when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Thorpe*, 504 Mich at 252-253.

The court initially allowed the prosecution to present a portion of the forensic interview recording under MRE 613(b) because the prosecution claimed (1) it was used for impeachment purposes, in addition to corroborating and clarifying ARW's testimony and portraying ARW's demeanor and age when the interview occurred two years earlier, and (2) the recording was admissible as extrinsic evidence of a prior inconsistent statement. The trial court subsequently determined the video was substantively admissible under MRE 803(5) as a recorded recollection because ARW recalled participating in the forensic interview and admitted her present memory of

the underlying incident was inferior when compared to at the forensic interview. The court gave no limiting instructions to the jury.

MRE 803(5) governs the admission of hearsay testimony under the "past recollection recorded" exception to the general hearsay rule. At the time of Perrigo's trial, the rule allowed admission of:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.[3]

If the foundational requirements of this rule are satisfied, a memorandum or record may be admitted into evidence regardless of the availability of the declarant. *People v Dinardo*, 290 Mich App 280, 293; 801 NW2d 73 (2010). The foundational requirements of MRE 803(5) are:

> (1) The document must pertain to matters about which the declarant once had knowledge; (2) the declarant must now have an insufficient recollection as to such matters; and (3) the document must be shown to have been made by the declarant, or, if made by one other than the declarant, to have been examined by the declarant and shown to accurately reflect the declarant's knowledge when the matters were fresh in his memory. [*Dinardo*, 290 Mich App at 293 (cleaned up).]

Traditionally, MRE 803(5) has applied to the reading into evidence of written documents, such as transcripts or police reports. See *People v Chelmicki*, 305 Mich App 58, 64; 850 NW2d 612 (2014) (involving the reading of a victim's witness statement to the police); see also *Dinardo*, 290 Mich App at 288 (considering the admissibility of a breath-test report); *People v Brown*,

---

[3] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ___ Mich ___ (2023). As amended, MRE 803(5) remains substantively the same, but now states:

> Recorded Recollection. A record that:
>
> (A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;
>
> (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and
>
> (C) accurately reflects the witness's knowledge.
>
> If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party.

unpublished per curiam opinion of the Court of Appeals, issued July 23, 2019 (Docket No. 340069), p 7 (considering the admissibility of an interview transcript between law enforcement and a witness). However, this Court has also examined, albeit primarily in unpublished caselaw, whether videorecordings qualified as recorded recollections under MRE 803(5). See *People v Rogers*, 335 Mich App 172, 197; 966 NW2d 181 (2020) (noting that a video depicting a conversation between the victim and a pastor was admitted into evidence because the victim was unavailable at that particular hearing, but opining "it is uncertain whether the video could be introduced as substantive, nonhearsay evidence at a future retrial"); see also *People v Woods*, unpublished per curium opinion of the Court of Appeals, issued December 19, 2019 (Docket No. 344313), p 5, rev'd on other grounds 506 Mich 938 (2020) (discussing whether it was appropriate to admit a videorecorded police interview of a witness, who was present at the apartment when the underlying shooting occurred); *People v James*, unpublished per curium opinion of the Court of Appeals, issued January 10, 2012 (Docket No. 301526), p 2 (evaluating whether the trial court abused its discretion when it admitted a videorecording of the defendant's son detailing child abuse).

A recorded recollection may be introduced under MRE 803(5) when a witness's memory of an event cannot be refreshed under MRE 612, if a proper foundation is laid. That foundation requires a showing that the document "accurately reflect[ed] the declarant's knowledge when the matters were fresh in his memory." MRE 803(5). Here, the forensic interview was conducted six years after the alleged abuse occurred. During the interview, ARW repeatedly claimed that she could not remember certain details. Although there is no standard time line for determining when matters are likely to be "fresh" in a witness's memory, there is no support for the notion that a six-year gap satisfies the rule.

The trial court attempted to evade the "freshness" requirement by focusing on the time between the trial and the forensic interview.[4] That is not the correct metric. The 2019 "document" was being used to refresh ARW's recollection of an event that had occurred in 2013. MRE 803(5) allows for the introduction of what would otherwise constitute hearsay because it has indicia of accuracy. "The guarantee of trustworthiness is found in the reliability inherent in a record made while events were still fresh in mind and accurately reflecting them." FRE 803, Advisory Committee Notes to the 1972 Rules.[5] While there is no bright-line rule regarding "freshness":

> where the lapse of time between the event and the actual recordation of the event
> in a memorandum or record is so substantial that it contradicts the very meaning of
> the term "fresh," that significant lapse of time weighs all but conclusively against
> a finding of freshness, absent other circumstances vouching for the recordation's

---

[4] "To say that it was fresh in her mind, well, the freshness there comes from the recency of the disclosure. She had disclosed it recently to her counselor. The counselor, of course, had gotten law enforcement and Child Protective Services involved. . . . And, thus, when she met at the CAC, it was in follow-up to her initial disclosure to that counselor. So it was as fresh as it was going to be, although still years separate from the actual incident itself."

[5] MRE 803(5) is identical to FRE 803(5).

freshness, accuracy, and trustworthiness. [*TWN, Inc v Michel*, 131 P3d 882, 888 (Utah Ct App, 2006).]

Furthermore, ARW was never asked whether the assault was "fresh in her mind" when she participated in the forensic interview, and her answers demonstrate that it was not. The trial court abused its discretion by misinterpreting MRE 803(5) and by allowing the prosecution to introduce portions of the recorded interview as recorded recollections.

"[I]t is more probable than not that [this] error was outcome determinative." *People v Lyles*, 501 Mich 107, 117-118; 905 NW2d 199 (2017) (quotation marks and citation omitted). Before the introduction of the recording, ARW testified she was unable to recall whether Perrigo touched her on the "outside" or the "inside" of her vagina. It was only after watching the recorded interview that ARW recalled informing the interviewer, "it just felt like [Perrigo] was trying to finger me[,]"and that Perrigo's conduct was painful. Furthermore, excerpts of the footage were woven throughout ARW's testimony, and she was the only witness to directly testify about the events. See *People v Douglas*, 496 Mich 557, 579; 852 NW2d 587 (2014) (quotation marks and citations omitted) ("In a trial where the evidence essentially presents a one-on-one credibility contest between the victim and the defendant, hearsay evidence may tip the scales against the defendant, which means that the error is more harmful.").

The videorecording was not harmlessly cumulative as it was the first instance when ARW definitively asserted that Perrigo digitally penetrated her. See *id*. at 582 (opining that the forensic interviewer's testimony and the videorecording of the victim's forensic interview "left the jury with a much fuller, clearer, and more inculpatory account of the alleged fellatio than that which was properly admitted through [the victim] and corroborated by [the victim's mother]"). Because the prosecution's case was primarily based on ARW's testimony, the "erroneously admitted statements during the forensic interview more probably than not 'tipped the scales' against the defendant such that the reliability of the verdict against him was undermined and a new trial is warranted." *Id*. at 582-583 (citations omitted).

The trial court also ruled the recorded interview qualified as "impeachment evidence." This, too, constituted an abuse of discretion.

"When a witness claims not to remember making a prior inconsistent statement, he may be impeached by extrinsic evidence of that statement." *People v Shaw*, 315 Mich App 668, 683; 892 NW2d 15 (2016) (quotation marks and citation omitted). "However, the purpose of extrinsic impeachment evidence is to prove that a witness made a prior inconsistent statement—not to prove the contents of the statement." *Id*. (cleaned up). MRE 613(b) addresses the admissibility of extrinsic impeachment evidence:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the

interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).[6]

Even if admitted, a prior inconsistent statement may be used only to impeach credibility. The admitted statement "is not regarded as an exception to the hearsay rule because it is not offered as substantive evidence to prove the truth of the statement, but only to prove that the witness in fact made the statement." *Merrow v Bofferding*, 458 Mich 617, 631; 581 NW2d 696 (1998).

When a party seeks to impeach a witness with an inconsistent statement, "a proper foundation must be laid by questioning the witness concerning the time and place of the statement and the person to whom it was allegedly made." *People v Rodriguez*, 251 Mich App 10, 34; 650 NW2d 96 (2002). Here, the prosecutor failed to lay an adequate foundation for use of the recorded statement as impeachment evidence. To lay that foundation

> the proponent of the evidence must elicit testimony inconsistent with the prior statement, ask the witness to admit or deny making the first statement, then ask the witness to admit or deny making the later, inconsistent statement, allow the witness to explain the inconsistency, and allow the opposite party to cross-examine the witness. [*Barnett v Hidalgo*, 478 Mich 151, 165; 732 NW2d 472 (2007).]

After the lawyers argued about the use of the video, ARW was asked by the prosecutor whether she recalled talking to Amy Minton "about the fact that Kade's fingers entered your vagina," and responded, "Now that you say it more, yeah." She did not *deny* making the statement to that effect in the forensic interview, which should have eliminated any alleged inconsistency with her trial testimony.

The trial court compounded that error by admitting the videorecording as substantive evidence. Even if ARW could have been impeached by statements she made in the interview, those statements should not have been introduced as substantive evidence. The improper admission of this evidence also warrants relief.

## IV. ADMISSION OF SDV'S TESTIMONY

Perrigo contends the prosecutor improperly bolstered ARW's credibility with SDV's detailed hearsay statements about ARW's disclosure of abuse to her. The prosecutor does not dispute that this evidence was improperly admitted. The only question is whether the error requires reversal. We need not address this issue in any detail. Although this error standing alone may not

---

[6] Effective January 1, 2024, MRE 613(b) provides:

> Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires. This subrule does not apply to an opposing party's statement under Rule 801(d)(2).

have warranted relief, it adds to the extensive errors occurring at Perrigo's trial, exacerbating the harm.

## V. SUFFICIENCY OF THE EVIDENCE

Perrigo challenges the sufficiency of the evidence supporting his CSC-I conviction. We are vacating this conviction and sentence based, in part, on the improperly admitted forensic interview recording and hearsay evidence. Accordingly, we need not consider the adequacy of the record evidence at this time. On remand, the prosecution will need to weigh the admissible evidence and determine whether charges can proceed against Perrigo. But the prosecution must make that determination in the first instance.

We vacate Perrigo's conviction and sentence for CSC-I and remand for further proceedings. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Stephen L. Borrello
/s/ Douglas B. Shapiro