245 N.J. Super. 466 (1991)
586 A.2d 269
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DONALD L. LINDSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 13, 1990.
Decided January 23, 1991.
*467 Before Judges KING, LONG and R.S. COHEN.
John E. Shields, Jr. argued the cause for appellant (Hoffman, DiMuzio, Hoffman & Marcus, attorneys, Joseph J. Hoffman, of counsel, John E. Shields, Jr., on the brief).
Craig V. Zwillman, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General of New Jersey, attorney, Craig V. Zwillman of counsel and on the letter brief).
The opinion of the court was delivered by KING, P.J.A.D.
This appeal concerns the adequacy of instructions to the jury in a criminal case. The instructions were delivered partly orally and partly in writing. We conclude that the instructions in their totality were both inadequate and inartful. We hold that failure to read all of the proper instructions to the jury was reversible error.
The defendant was indicted on August 13, 1987 on charges of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); second-degree burglary, N.J.S.A. 2C:18-2; and fourth-degree theft, N.J.S.A. 2C:20-3. The case was tried in December 1989 and verdicts of guilty on all counts were returned on December 22. A motion for new trial based on a claim of ineffective assistance of counsel was denied. Defendant was sentenced to concurrent seven-year terms on the assault and burglary counts and a consecutive nine-month term on the theft count. Defendant contends on appeal that: (1) the jury instructions were so inadequate as to constitute plain error, (2) counsel was ineffective, and (3) the supplemental jury instruction on deadlocked deliberations was in error.

I
The prosecution arose out of an assault on a young woman in Clayton in the early morning hours of July 4, 1987 *468 while she was alone in her home. The defendant and the victim had been social friends for some time before the event. Defendant had been accustomed to coming and going from her home rather freely. After the attack she went to the hospital, got 13 stitches in her scalp, and was observed for a concussion for four days as an inpatient.
Defendant denied that he was the attacker. The jury had to resolve issues concerning the identity of the assailant, the intent upon entry, the degree of the assault, and the occurrence of a theft. Defendant in the past had possessed property of the victim under circumstances from which the jury could have concluded that his possession of her property in this situation arose from a permissive rather than a criminal taking. Thus the burglary and theft aspects were more complex than in a routine case where the victim and the alleged perpetrator were each unknown to the other before the crime.
The jury retired to deliberate on Thursday, December 21, 1989 at 11 a.m. The jury asked for and received reinstruction on reasonable doubt at 2 p.m. on that date. At 2:45 p.m. on that date the jury reported that they were deadlocked. The judge consulted with and gave counsel a copy of "the ABA charge that was approved in State v. Czachor, 82 N.J. 392, 413 A.2d 593 (1980)." The judge then brought the jury into the courtroom and told them:
Okay. Now, with that discussion of procedurally how we operate and what the possibilities are for your continuing, I have something to read to you.
The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto and your verdict must be unanimous. I already told you that. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment.
Another judge who was older and wiser, more experienced than I one time says or told me that when he told jurors in situations like this was why don't you people consider changing position and adopting the other person's viewpoints. And if you are voting in direction A say, all right, "I'm going to assume the arguments for direction B and vice versa, see if you can convince one another of something."
I'm not telling you to do it. I'm not even suggesting that you should do it. I'm telling you that that is one way that others have resolved the issue if, in *469 fact, it's resolvable. It may not be. You're not under any direction to come to grips with it. Each of you must decide the case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors.
In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, but not  do not surrender your honest convictions as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans. Meaning you're not assigned to a particular side. You are judges, judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.
And with that I would ask you please go back and try again.
Defendant objected to the underlined portion of the charge as encouraging the jurors who believed that he was not guilty to adopt the prosecutor's position. While we do not find the underlined portion of the charge reversible error in itself, we think this folksy invitation to exchange viewpoints would have been better left out.
The jury later that afternoon wanted certain testimony of the victim read back. After a discussion with counsel and a search of the record, the judge called the jury back into the courtroom. He told them that he had not been able to find the answer to their question. Since it was after 4:30 p.m. he said that unless they were on the brink of a decision, he would excuse them until the next morning, Friday, December 22nd. A discussion ensued with one juror concerning starting at 10 a.m. the next morning rather than 9 a.m. because she wanted to be with her students for their Christmas exchange. A second juror then questioned the judge:
JUROR ELEVEN: Can this thing go any longer besides tomorrow?
THE COURT: Probably not. I really don't know how.
JUROR ELEVEN: Can it, though?
THE COURT: Anything 
JUROR ELEVEN: I'm just saying 
THE COURT:  sarcastic or funny. Can it? Unfortunately, it's subject to whatever I say. And I have to get a sense of what's going on and depends on where we are tomorrow. That's all. I'm not trying to be coy.
You say can it  let me just give you a hypothetical situation. Let's say something happened that we had to adjourn at 2:00 for some reason, but you folks gave me some indication you thought you were making progress. No rule *470 says we can't come in Saturday morning and finish. I mean, I'm not telling you 
JUROR ELEVEN: I'm not worried about Saturday.
THE COURT: But you wanted to know, you know, can it. That's a very broad answer, yes. Okay.
JUROR ELEVEN: Okay.
THE COURT: Depends on how it goes, what happens, what the atmosphere is like, where you folks stand, what you told me, what you ask me, all of those things.
But to answer your specific question, yes, it is legally possible for me to say come back Saturday and finish up.
Since this discussion took place on Thursday, December 21, 1989 and Christmas was on the following Monday, defendant claims that the judge planted in the jurors' minds "the unwelcome prospect of having their weekend plans disrupted by the continuation of the deliberations" and subjected the jurors to a coercive influence which damaged their ability to attend to their duties without distraction. At 12:05 p.m. on Friday, December 22nd, the jury returned with its verdict of guilty of second-degree aggravated assault, second-degree burglary and fourth-degree theft.

II
We first consider the jury instructions. At the close of the trial, the judge instructed the jury orally. He also gave the jury a "cut and paste" sheet containing the definitions of the offenses and types or degrees of culpability. (Reproduced APPENDIX A) There was no objection to the charge as given. R. 1:7-2. Defendant claims that the charge was so confusing and inadequate that "plain error" existed, requiring reversal despite the lack of an objection. R. 2:10-2. We agree. We also hold that the failure to read the entire charge to the jury requires reversal. The fundamental importance of a proper charge, read in full to the jurors, naturally is highlighted in a close case where basic disagreement emerges and is articulated during the course of jury deliberation.
*471 After the customary introductory amenities, the judge told the jury:
I am going to give you a cut and paste sheet, all right. That's why it looks like it looks. I have taken  because in the statute there are many parts of it that don't pertain to this case. You know, maybe something involving a weapon or something. I have cut all that out. I have taken the time to Scotch tape it together and photocopy it. I think it will be very helpful to you in determination of the technical definitions of the offenses that are involved here. And I'm going to briefly read them.
He then started to define the crimes. This is the way he instructed the jury on aggravated and simple assault:
Now, the first charge is aggravated assault. And a person is guilty of aggravated assault if he attempts to cause serious bodily injury to another or causes such injury purposely or knowingly or under circumstances manifesting extreme indifference to the value of human life, he recklessly causes such injury and that is one grade of offense.
And then I have here for you a definition of serious bodily injury which means any bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ. And then bodily injury means physical pain, illness or any impairment of physical function.
And then I have a definition here of simple assault, because if you do not find  first of all, you're going to have to figure out the identification problem. In this case I'll say it right up front to the satisfaction of all, if you find that the State has proven beyond a reasonable doubt that Donald Lindsey assaulted, beat, hammered her head on the floor, Miss Pellicano, then he's guilty of something. You'll decide what.
If you find that the State has not proven that it was he that did it or if you decide factually that he went back a second time, just saw her there, he's not guilty of anything. In other words, the fact that he went back a second time and she had already been beaten by somebody else, even if he then took the jewelry or whatever, he's not guilty of anything. In order for you to find him guilty, has to be that he's the one that committed the assault. Then you'll find what he's guilty of.
You're satisfied of that, okay, satisfactory, men?
MR. CONA: [defense counsel] That's fine.
MR. SALVATI: [prosecutor] Fine, Judge.
THE COURT: So simple assault, person is guilty of assault if he attempts to cause or purposely, knowingly or recklessly causes bodily injury to another or attempts by physical menace to put another in fear of imminent serious bodily injury.
So if you find the defendant guilty of aggravated assault, naturally you don't have to consider simple assault. There is just one count in the indictment. If you find that the State has proven that he did commit an assault upon her, but *472 you're not satisfied it was an aggravated assault, you have to decide if it was a simple assault.
He then proceeded to the crime of burglary:
Now, similarly with burglary, a person is guilty of burglary if with the purpose to commit an offense he enters a structure. All right. So if Mr. Lindsey  which is proven beyond a reasonable doubt that Mr. Lindsey went into that house with the purpose of stealing, burglary. If he went in to the house with the purpose of committing an assault, or both burglary and assault, burglary.
But we have a second question. If you say we find him guilty of burglary, I'm going to say well, you find him guilty of burglary in the second degree or in the third degree. You say what's the difference. The difference is if he went in only to commit a theft, it's third degree burglary. If he went in with the purpose to commit an aggravated assault of  that's not really so  if he went in to inflict or attempt to inflict bodily injury on anyone, then it's second degree burglary.
I'm going to give that to you in writing, all right. So when you say  if you say, Judge, we are satisfied beyond a reasonable doubt that Mr. Lindsey went in and Mr. Lindsey did it with the purpose to commit an offense, and he, therefore, committed a burglary, I'm going to say to you, well, did he go in just to steal or did he go in and also inflict bodily injury on Miss Pellicano while he was there, and you'll tell me which was which and what the degree or third or second. It's all spelled out for you in writing. And you'll take it in with the exhibits.
He never defined theft orally for the jury.
The judge then moved on to define the mental state or mens rea necessary for criminal liability. He said in respect of this point:
All through the criminal law the words purposely and knowingly and recklessly are used because in order for a person to be guilty of a crime, they have to have a certain mental state, a certain mental attitude. They have to have a purpose or have to be reckless in what they are doing. They have to know what they are doing, but not actually intend a specific result that finally comes about.
I'm going to give you those definitions as well in writing because, frankly, I find them incomprehensible when they are just spoken to you. And so you'll have them before you. But essentially it's a  the highest degree of mental purpose and then a little less, then a little less.
You know, purposely means it's absolutely intentional. If I take a pencil, I want to break it in three places and I break it in three places, that is what I intended to do, that would be purposely.
If it's knowingly, maybe I just intended to break it and it breaks in three places, Well, I knew it was going to break when I did it, but I didn't exactly intend the precise result.

*473 Recklessly just means I do something, I don't care what the result is, but it's pretty  like looks like there is going to be a disastrous result, I just don't care about it. That's sort of it. You read it. And the law will tell you precisely what it means. Perhaps you'll explain it to me.
Again, he did not read these "mental state" instructions to the jury but gave them in written form only. (See APPENDIX A). And his comments, "I find them incomprehensible when they are just spoken to you," and "[P]erhaps you'll explain it to me," demeaned his role and duty in the trial as the authoritative source of the law.
He concluded his remarks on the substantive law by saying:
They are the definitions for the offenses themselves. That's what he's charged with. But as counsel said, the really hotly contested or central issue in this is identification. The State's required to prove the elements of the offense, but in this particular case they're kind of secondary to the prime issue.
Doubtless, the identity of the perpetrator was the core of the dispute but the State still had the burden of proving the degree of the assault, the criminal intent upon entry, if any, and the intent to commit a theft, if any. These matters were hardly "secondary" because defendant, even if guilty, could have been reasonably found guilty of "simple assault" alone, a disorderly persons offense, N.J.S.A. 2C:12-1(a)(1), punishable up to a maximum of six months, N.J.S.A. 2C:43-8. He also could have been found innocent of theft, or of any criminal intent upon entry into the victim's home in the circumstances.
Defense counsel had no objections to the jury charge except to ask the judge to make it clear that the burden of proof was on the State beyond a reasonable doubt as to each element of the offenses and as to the identity of the defendant. As requested, the judge gave this admonition to the jury orally. No written verdict sheet was submitted to the jury.
The defendant properly contends that "a review of the charge makes clear that [the judge] omitted [reading] substantial portions of the instructions pertinent to the charges of aggravated assault and burglary and failed to define the charge of theft at all" in his oral instructions. Defendant also correctly stresses that "compared with the model jury charges, the definitions *474 given the jury of purposeful, knowing and reckless conduct [were] wholly inadequate to constitute a legally sufficient definition of those mental states." He urges that any defect in the oral instructions may not be cured by the "cut and paste sheet" given to the jurors. Notably, the jurors were not specifically told that each must read the "cut and paste" sheet. Nor was the foreperson told to read it to the others.
A good illustration in context of the poverty of the oral charge is shown by the absence of any oral definition of theft. During the trial, both the victim and the defendant testified that in the past they had played "a sort of game" where each would borrow belongings of the other. The victim said that it had been "a big joke to try and get it back. That's all it was about. That's how we got into this taking." The jurors, or some of them, may never have been aware that in order to find defendant guilty of theft, the law requires that the State show beyond a reasonable doubt an intent to deprive the owner of the property permanently. N.J.S.A. 2C:20-3a. See State v. Green, 170 N.J. Super. 292, 295-296, 406 A.2d 310 (App.Div.), certif. denied 82 N.J. 271, 412 A.2d 778 (1979); State v. Leicht, 124 N.J. Super. 127, 131, 305 A.2d 78 (App.Div. 1973). Some of the victim's jewelry was found in defendant's room after the episode. He denied any criminal theft of the jewelry from her, claiming he took it as part of the "game ploy" described by the parties.
We find the oral instructions to the jury totally inadequate in the circumstances and "plain error" requiring a new trial. At the minimum, the entire instructions should be read to the jury. We cannot assume that each juror will independently read a written instruction or that a foreperson will read it to the entire jury in an objective fashion, as a judge would do. In this case, the jurors were not even specifically instructed to each read the instruction or to listen carefully while the foreperson read it. Nor will we even assume that each juror was sufficiently literate to read and comprehend the "cut and paste" instruction.
*475 In this jurisdiction, the "traditional function of the judge is to instruct the jury as to the law governing the issues to be decided by them under the facts of the particular case." State v. Butler, 27 N.J. 560, 594, 143 A.2d 530 (1958). The "classical practice" is for the judge to outline the applicable criminal law, "explaining and defining the offense charged"; a "mandatory duty" to do so exists on the part of the trial judge. Id. at 594-595, 143 A.2d 530. Our Supreme Court has observed that "[m]ost laypersons are uneducated in the law and do not understand lawyers' jargon or the nuances involved in many of the concepts with which they are called upon to deal in the jury room." State v. Green, 86 N.J. 281, 288, 430 A.2d 914 (1981). Since "a jury may not even have the luxury of the availability of a dictionary during its deliberations," a "faithful performance of the court's duty of expounding law for the jury's guidance and instruction requires a plain and clear exposition of the issues." Id. These responsibilities of the trial judge in orally instructing the jury have been most recently revisited by our Supreme Court in State v. Martin, 119 N.J. 2, 18, 573 A.2d 1359 (1990), and State v. Concepcion, 111 N.J. 373, 379, 545 A.2d 119 (1988). In sum, the duty of the judge is to help the jury understand the substantive criminal law concepts, not to augment confusion and misapprehension. "Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case." State v. Concepcion, 111 N.J. at 379, 545 A.2d 119.
Traditionally, jury instructions in this State had been oral only. R. 1:8-8 was amended in 1982 by adding this sentence: "The court, in its discretion, may submit a copy of all or part of its instructions to the jury for its consideration in the jury room." See Pressler, Current N.J.Court Rules, Comment R. 1:8-8 at 95 (1991). Nothing in the rules empowers a judge to issue an instruction in written form only. In her treatise, Judge Pressler comments: "Caution should be exercised when a part of the charge only is submitted in order to avoid *476 prejudice possibly resultant from lack of context or overemphasis." Id.
Our review of the extant authorities discloses a strong view that the judge should read all instructions to the jurors, not rely on jurors to read them, or the foreperson to recite them to the jury. In United States v. Noble, 155 F.2d 315 (3d Cir.1946), the judge did not instruct the jury on the charges but gave the jury the criminal information "for the purpose of considering and knowing what the charges are." Id. at 317. Judge Maris said that this was not good enough. "It was essential that they be instructed upon the rules of law which they were to apply, the most fundamental and important of which were the essential elements of the crime charged." Id. at 318. No less was required for an informed general verdict. He concluded, and we agree, that:
Moreover, we think that even if the information had contained a full recital of all the applicable legal principles the trial judge would not have fulfilled his duty in this regard merely by sending the information out with the jury to read if they chose to do so, during their deliberations. For not only are counsel and the defendant entitled to hear the instructions in order that they may, if they are incorrect, object to them and secure their prompt correction by the trial judge, but it is equally important to make as certain as may be that each member of the jury has actually received the instructions. It is therefore essential that all instructions to the jury be given by the trial judge orally in the presence of counsel and the defendant. We conclude that the failure in the present case to instruct the jury upon the elements of the crime was error. [Id. at 318.]
See also Morris v. United States, 156 F.2d 525, 531 n. 4 (9th Cir.1946) (great weight of authority holds that written instructions not sufficient); 88 C.J.S.2d Trial § 333 at 872-873 (1955); Annotation, "Written Instructions with Criminal Jury," 91 A.L.R.3d 382, § 401 (1979 & Supp.) (necessity that judge read instructions to jury).
In State v. Norris, 10 Kan. App.2d 397, 699 P.2d 585 (1985), the jury simply was given written instructions in a criminal case. There was "no indication in the record that the jury was instructed to read the written instructions prior to beginning deliberations." The Kansas intermediate appellate court reversed *477 the conviction, relying on United States v. Noble, supra, concluding "that an adequate written statement of the law is insufficient if it is not delivered orally as well." Id. at 587. The Kansas court gave good reasons for oral instructions which we think bear repeating here:
K.S.A. 22-3414, like the Indiana statute, does not mandate that the court "shall instruct" the jury orally. However, we too conclude that oral instruction is vital to the fulfillment of the court's duty to instruct the jury. Instruction of the jury is one of the most fundamental duties of the court and it is only through their oral delivery that the court can be assured that each member of the jury has actually received all of the instructions. If, for example, written copies of the instructions are given to each juror, a divergence in literacy and reading comprehension may well leave some jurors uninstructed. On the other hand, if the foreman is directed to read the instructions to the other jurors, defendant is deprived of the opportunity to witness the manner in which the foreman intones the instructions. A judge is obligated to act in an impartial and unbiased manner in delivering instructions. He may not sneeringly describe the defendant's defense or make editorial comments while reading the instructions. A jury foreman is under no such constraint once the case has been submitted. Moreover, if, as in this case, the court does not even instruct the jury to read the instructions before deliberating, there is no assurance that the instructions were in fact read or that the verdict is based upon an application of the law to the evidence. [699 P.2d at 588.]
Other recent authorities in general accord are Simmons v. State, 541 So.2d 171 (Fla. Dist. Ct. App. 1989); People v. Cartee, 104 Ill. App.3d 754, 60 Ill.Dec. 529, 532, 433 N.E.2d 326, 329 (1982); Drake v. State, 271 Ind. 400, 393 N.E.2d 148, 149 (1979); People v. Gonzalez, 157 A.D.2d 625, 550 N.Y.S.2d 643 (1990), appeal denied 76 N.Y.2d 893, 561 N.Y.S.2d 555, 562 N.E.2d 880 (1990); Commonwealth v. Oleynik, 524 Pa. 41, 568 A.2d 1238, 1241 (1990); Hollis v. Ferguson, 244 Or. 415, 417 P.2d 989, 993 (1966).
We conclude that the instructions, as rendered, were fundamentally flawed. They were not read in their entirety to the jury. Each juror was not told to read them. The foreperson was not told to read them aloud at the start of deliberations. We will not indulge any general assumption of literacy of jurors as an excuse for overlooking a defendant's fundamental procedural entitlement. The judge's editorial comments tended to demean his role as the legal authority at the trial. The *478 combination of the oral and written instructions was in the overall confusing and disorganized.
We reverse on this ground alone. We do not reach defendant's contentions that he was inadequately represented and that the judge's supplementary instructions were unduly coercive and forced a verdict as the holiday season approached.
Reversed.

*479