**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1164-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ROBERT A. HARRELL,
a/k/a ROBERT A. HALL,
ROBERT A. HARRELLJONES,
ROBERT A. JONES, and
ROBERT HARRELL,

    Defendant-Appellant.

_____

Submitted December 4, 2023 – Decided February 14, 2025

Before Judges DeAlmeida, Berdote Byrne, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 20-01-0155.

Joseph E. Krakora, Public Defender, attorney for appellant (Laura B. Lasota, Assistant Deputy Public Defender, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Valeria Dominguez and David M.

Galemba, Deputy Attorneys General, of counsel and on the briefs).

The opinion of the court was delivered by

DeALMEIDA, J.A.D.

Defendant Robert Harrell appeals from the November 4, 2021 judgment of conviction entered after a jury found him guilty of six offenses arising from the attempted murder, aggravated assault, and armed robbery of his father, and five offenses arising from the armed robbery and aggravated assault of a man defendant encountered on a street corner the day after the attempted murder. Defendant also challenges the sentences he received for his convictions, including the extended-term sentence imposed under N.J.S.A. 2C:44-3(a) for his conviction for attempted murder.

We affirm defendant's conviction for attempted murder, vacate his extended term sentence for that offense, and remand for proceedings consistent with the holdings in Erlinger v. United States, 602 U.S. 821 (2024), and State v. Carlton, ___ N.J. Super. ___, ___ (App. Div. 2024), with respect to that conviction. We reverse defendant's remaining convictions and remand for a new trial on those charges.

A-1164-21

# I.

Defendant's convictions arise from two incidents, the details of which we derive from the trial record.

## A.   The Attempted Murder of Defendant's Father.

On December 31, 2018, defendant visited his father, Anthony Jones, at Room 233 at the Econo Lodge motel in Atlantic City.  At the time, Jones knew defendant was carrying a .357 handgun.  Defendant asked Jones for money.  Jones gave him around fifty dollars.  Defendant, however, saw that Jones had more cash on his person and asked what he intended to do with that money.  Jones told defendant the remainder of the money was for Jones's grandchildren.  Jones then asked defendant to add minutes to his cellphone.  Defendant agreed, but said his credit card was not working.  He left the room to resolve the issue with his credit card, saying he would "be right back."

A short time later, Jones saw a silhouette walk by his window and heard a knock on the door of his room.  Assuming it was defendant, Jones opened the door without looking.  When he opened the door, Jones heard "one loud pop and then . . . felt dizzy."  He "thought [he] had been punched in the face or something because [he] was so dizzy."  By the time Jones "got it together to realize what

was really going on, [he was] staring at [defendant] in his face asking 'oh, God, why?'" Jones saw defendant was wearing a hooded sweatshirt.

Jones threw his coat over his head, dove onto the floor, and tried to thrust his head under the bed as far as possible. Once partially under the bed, Jones acted dead. Defendant then rummaged through Jones's pockets and took about $2,000 in cash.

After defendant left, Jones stumbled out of his room and went next door to Room 235, where his friend was staying. The friend called 9-1-1. Paramedics found Jones "gurgling, drowning off [his] own blood" and unconscious. They rushed Jones to a hospital. He was later transferred to a trauma center, where he remained in a coma for fourteen days. Defendant had shot his father four times in the face and twice in the chest. Jones survived, but suffered a fractured skull, a shattered jaw, and lost half of his tongue and most of his bottom teeth.

Atlantic City Police Department (ACPD) Officer Bryan O'Neill and two detectives were dispatched to the Econo Lodge in response to a report of a gunshot victim. On arrival, the officers observed Jones outside Room 235 injured. O'Neill noticed a large amount of blood next to Jones and a blood trail leading from Jones's room to Room 235. When O'Neill entered Jones's room, he saw a large amount of blood and what appeared to be evidence of a struggle.

4

The officers tried to speak with Jones, but could not understand what Jones was trying to say.

Detective Joseph Procopio arrived at the Econo Lodge after Jones had already been transported from the scene. In Jones's room Procopio saw "a significant amount of blood and what appeared to be blood and blood splatter, as well as other things thrown about in the room with [what] appeared to be . . . bodily flesh, things of that nature . . . ." Two projectiles from bullets or rounds of ammunition were found and recovered from the room.

A surveillance video recording from the motel and a neighboring hotel showed the suspect drive into the Econo Lodge parking lot in a silver Hyundai sedan at around 7:00 p.m. It also showed the suspect get out of the car and walk into the motel lobby. He was wearing a black hooded sweatshirt with the Nike emblem and black boots. A tattoo was visible on the suspect's right hand.

The video also depicted Jones and the suspect walking to Jones's room. At about 9:00 p.m., just before the shooting, the suspect is seen leaving Room 233 and walking toward the parking lot. The suspect is captured accessing the rear of the Hyundai, putting on a black jacket and reaching into the car. The suspect then walks back to Room 233 and enters the room. Shortly thereafter,

A-1164-21

the suspect leaves Room 233 and drives away in the Hyundai. Jones is then seen stumbling out of Room 233, hunched over, and heading toward Room 235.

Mahedi Khan, the motel's front-desk manager, identified defendant as the person in the surveillance video recording with Jones. He was familiar with defendant from seeing him at the Econo Lodge on a weekly or biweekly basis. He recalled seeing defendant at the hotel on the day of the shooting when defendant approached him at the front desk and asked to charge his cellphone. Kahn also identified defendant in an image taken from defendant's Facebook page. Jones identified defendant in a photograph as the person who shot him.

The projectiles recovered from Jones's room were determined to be from a .357 chambered handgun or a .38 special chambered handgun. Police did not recover the silver sedan seen in the surveillance video recording or the handgun used in the shooting.

B.    The Robbery and Stabbing of Barton.

The following night, Diana-Jo King was at a corner in Atlantic City waiting for her fiancé, Andrew Barton. When Barton arrived, King's friend "Bobby," who she had known for approximately two years, walked up and asked for a ride to the Econo Lodge. King identified defendant as "Bobby."

6

King told defendant she could not give him a ride because she was with Barton. According to King, defendant was persistent and kept asking her for a ride. King ultimately said, "[a]ll right, go ask [Barton]. If [he] says okay then it's fine." Defendant asked Barton for a ride. Barton walked up to King and said, "what's up with this dude? Get him away from me." Defendant began following Barton and pestering him for a ride. King stepped in between defendant and Barton, put her hands up to block defendant, and stated she and Barton could not give him a ride.

Defendant responded angrily. He started walking away, but turned around and grabbed King's pocketbook, which was strapped across her chest and shoulder. When defendant grabbed and pulled on the pocketbook, both King and defendant fell to the ground. Defendant was on top of King and kept pulling on her pocketbook as the two struggled.

Barton had walked away and around the corner. When he returned, he saw King and defendant struggling. He tackled defendant, knocking him off King. When King stood up, she noticed defendant had "a pointy, rusty object in his hand" and saw him running away and around the corner.

King said Barton "didn't look right. His face was white. He was very shaky. He was clammy." King heard Barton say, "I think he got me." She saw

A-1164-21

blood spurting out of Barton's back and drove him to the hospital. Barton had been stabbed once in the flank, puncturing his lung.

While at the hospital, King spoke with ACPD Detective John Sharkey and told him she knew who stabbed Barton. Sharkey showed King a photo of defendant and King identified defendant as Barton's assailant. Barton was unable to identify his assailant, but told the detective the man who stabbed him was King's friend.

C.    Defendant's Arrest and Indictment.

Police arrested defendant in the lobby of the Econo Lodge on the night of Barton's stabbing. At the time of his arrest, a bloody knife fell out of defendant's pocket. He was wearing a black hooded Nike sweatshirt and black boots and had a tattoo on his right hand. A buccal swab taken from Barton later matched a DNA sample taken from the knife in defendant's possession at the time of his arrest.

A grand jury subsequently indicted defendant. With respect to the shooting of his father, the grand jury charged defendant with: (1) first-degree attempted murder, N.J.S.A. 2C:5-1(a) and N.J.S.A. 2C:11-3(a)(1) (count one); (2) first-degree robbery, N.J.S.A. 2C:15-1(a)(1) (count two); (3) second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count three); (4) second-degree

possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); (5) second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1) (count five); (6) third-degree theft, N.J.S.A. 2C:20-3(a) (count six); and (7) second-degree possession of a weapon by certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (count eleven).

With respect to the Barton's stabbing, the grand jury charged defendant with: (1) first-degree robbery, N.J.S.A. 2C:15-1(a)(1) (count seven); (2) second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count eight); (3) third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count nine); (4) fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count ten); and (5) fourth-degree possession of a weapon by certain persons not to have weapons, N.J.S.A. 2C:39-7(a) (count twelve).

D.    The Trial.

The certain persons charges were bifurcated from the remaining charges of the indictment, which were tried together without objection from defendant. In addition to the testimony of several detectives and medical experts, Jones testified and identified defendant as his assailant. Khan also testified and identified defendant as Jones's son and the person in the surveillance video

recording with Jones on the night of the shooting. King testified and identified defendant as the man who stabbed Barton.[1]

A jury convicted defendant of all counts, except for the theft charge related to the shooting of his father, of which he was acquitted.

Thereafter, the court held a bifurcated trial on the certain persons offenses. The jury convicted defendant on both counts.

E.    Sentencing.

The State moved to sentence defendant to an extended-term sentence on the attempted murder conviction as a persistent offender pursuant to N.J.S.A. 2C:44-3(a). In support of its application, the State relied on defendant's six prior convictions. Prior to trial, defendant had stipulated to his prior convictions in the event he chose to testify. In response to the State's application, defense counsel stated,

> [s]o, look, technically, is he a persistent offender? Does he meet the criteria? Yes, I think, based upon the statute, he does. But I don't think an extended-term should be imposed here or a life sentence, because like I said, his history, his drug use, unfortunately, it was never dealt with properly.

---

[1] At the time of trial, Barton was deceased. His cause of death is not related to the stabbing.

The court granted the motion, finding the State had established each of the elements of N.J.S.A. 2C:44-3(a).

At sentencing, the court found five aggravating factors and no mitigating factors and concluded the aggravating factors substantially outweighed the absence of mitigating factors. After merging counts two, three, four, and five into the attempted murder conviction, the court sentenced defendant to an extended forty-year term of imprisonment, with a twenty-year period of parole ineligibility on that count.

The court merged counts eight, nine, and ten into the first-degree robbery conviction relating to Barton, for which it imposed a twenty-year term of imprisonment, with an eighty-five-percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The court directed that sentence to run consecutively to the sentence imposed on the attempted murder conviction.

On the certain persons conviction arising from the attempted murder, the court imposed a five-year term of imprisonment, subject to a five-year period of parole ineligibility. On the certain persons conviction arising from the robbery of Barton, the court imposed a one-year term of imprisonment. The court directed the sentences on the certain persons convictions run consecutively to

11

each other and to the terms imposed on the convictions for attempted murder and robbery. In the aggregate, the court sentenced defendant to sixty-six years in prison with a forty-two-year period of parole ineligibility.

The State moved to correct an illegal sentence based on the court's failure to impose a NERA term on the attempted murder sentence and its misconception that the sentences for the certain persons convictions were required to run consecutively to the terms imposed on the attempted murder and robbery convictions. The court granted the motion and resentenced defendant on the attempted murder conviction to a thirty-year term of imprisonment, with an eighty-five-percent period of parole ineligibility, and on the robbery conviction to a consecutive twenty-year term of imprisonment, with an eighty-five-percent period of parole ineligibility. The court also revised the sentences on the certain persons convictions by directing that they run concurrently to the sentences imposed on the attempted murder and robbery convictions. After resentencing, defendant received an aggregate fifty-year term of imprisonment, with a forty-two-and-one-half-year period of parole ineligibility.

This appeal follows. Defendant raises the following arguments.

POINT I

THE TRIAL COURT'S FAILURE TO <u>SUA SPONTE</u>
SEVER THE COUNTS AS TO THE SEPARATE

VICTIMS DEPRIVED DEFENDANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

POINT II

SEVERAL CRITICAL ERRORS AND OMISSIONS IN THE JURY CHARGE DEPRIVED DEFENDANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

A.   THE TRIAL COURT NEVER ORALLY DEFINED THE TERM "KNOWLEDGE."

B.   THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE JURY ON GRADING ENHANCEMENTS FOR ROBBERY THAT WERE NOT INCLUDED IN THE INDICTMENT.   THIS ERROR WAS COMPOUNDED BY THE TRIAL COURT'S INCOMPLETE VERDICT SHEET FOR BOTH ROBBERY CHARGES.

C.   THE INSTRUCTIONS FOR THE CERTAIN PERSONS OFFENSES WERE FLAWED IN MULTIPLE RESPECTS.

1.   THE TRIAL COURT ERRONEOUSLY REFERRED THE JURY TO ITS PRIOR VERDICT FOR POSSESSION OF A FIREARM AND A WEAPON, DIRECTING THE VERDICT ON THE CERTAIN PERSONS OFFENSES.

2.   THE TRIAL COURT'S INSTRUCTIONS DIRECTED THE VERDICT AS TO THE PREDICATE OFFENSE FOR THE CERTAIN PERSONS OFFENSES.

A-1164-21

POINT III

THE TRIAL COURT ERRED IN REMOVING DEFENDANT FROM THE COURTROOM AND TRYING HIM ON THE CERTAIN PERSONS OFFENSES IN ABSENTIA WITHOUT FIRST ADOPTING A REASONABLE METHOD OF COURTROOM DISCIPLINE WHICH WOULD PERMIT HIM TO REMAIN IN THE COURTROOM. THE COURT COMPOUNDED THE ERROR BY TELLING THE JURY WHY DEFENDANT HAD BEEN REMOVED.

POINT IV

DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE AND SHOULD BE REDUCED.

A. THE SENTENCING COURT DOUBLE-COUNTED DEFENDANT'S PRIOR OFFENSES WHEN APPLYING THE EXTENDED TERM AND AGGRAVATING FACTORS THREE AND SIX.

B. THE SENTENCING COURT ERRED IN APPLYING AGGRAVATING FACTORS ONE AND TWO.

C. THE SENTENCING COURT ERRED IN IMPOSING A MAXIMUM SENTENCE FOR FIRST-DEGREE ROBBERY.

D. THE SENTENCING COURT'S [STATE V. YARBOUGH, 100 N.J. 627 (1986)] ANALYSIS FAILED TO TAKE INTO CONSIDERATION THE OVERALL FAIRNESS OF THE SENTENCE IMPOSED.

14

In its merits brief, the State acknowledged that in the bifurcated trial on the certain persons charges, the jury instructions neither followed the model jury instruction nor met the requirements of State v. Ragland, 105 N.J. 189 (1986), where the Court held that in bifurcated trials on certain persons offenses, a defendant is entitled to an instruction that the jury disregard its prior verdict and consider the evidence anew. Conceding the trial court did not properly instruct the jury, the State agrees defendant's certain persons convictions should be reversed and a remand ordered for a new trial on those charges. Given the State's concession, we need not address defendant's arguments that the trial court made several errors in its jury instructions with respect to the certain persons offenses and erred when it removed defendant from the courtroom during the trial of the certain persons charges.

II.

A. Severance.

Defendant argues the trial court erred when it did not sua sponte sever the charges relating to Jones from the charges relating to Barton and try the matters separately. He contends the accusations involve two clearly separate, unrelated episodes that could only be fairly adjudicated by different juries in separate proceedings. According to defendant, allowing the same jury to hear about all

the alleged bad acts addressed in the indictment prejudiced him and violated his rights to due process and a fair trial.

The State argues defendant's severance argument is precluded by the invited error doctrine. In support of its position, the State notes defendant did not move for severance, having made a deliberate choice to acquiesce in the trial of all charges together. As stated in the joint pretrial memorandum signed by defendant and his counsel, "defendant chooses not to file motion to sever 1/1/2019 offense as a matter of trial strategy." Nonetheless, the State argues, the charges were properly tried together because the proofs as to the two victims were probative to motive and identity for both criminal acts.

Our courts have long recognized defendants may waive separate trials when they perceive a strategic advantage in doing so. See e.g., State v. Buonadonna, 122 N.J. 22, 39 (1991) ("[T]he right to . . . obtain severance of a trial is subject to tactical considerations that could lead a reasonable defendant, in consultation with counsel, to waive the right."); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 1.1 on R. 3:15-2(a) (2025) ("The severance right accorded by this rule may be waived by counsel as a matter of trial strategy and tactics[.]"). "Strategic decisions made by defense counsel will not present grounds for reversal on appeal . . . ." Buonadonna, 122 N.J. at 44. "The

A-1164-21

defendant cannot . . . request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable then condemn the very procedure he sought and urged, claiming it to be error and prejudicial." Ibid. (quoting State v. Pontery, 19 N.J. 457, 471 (1955)).

In addition, under the invited error doctrine, a defendant cannot profit from an error that was "induced, encouraged or acquiesced in, or consented to by defense counsel . . . ." State v. Van Syoc, 235 N.J. Super. 463, 465 (Law Div. 1988), aff'd, 235 N.J. Super. 409 (App. Div. 1989). Encouraged errors "ordinarily are not a basis for reversal on appeal . . . ." State v. A.R., 213 N.J. 542, 561 (2013) (citing State v. Corsaro, 107 N.J. 339, 345 (1987) (quoting State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974))). "The doctrine is implicated 'when a defendant in some way has led the court into error . . . .'" Id. at 562 (quoting State v. Jenkins, 178 N.J. 347, 359 (2004)). It applies "in a wide variety of situations." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. M.C., 201 N.J. 328, 340-41 (2010)).

We are convinced defendant elected not to seek severance of the charges for strategic reasons. His counsel expressly so stated in a memorandum defendant signed. Having made that strategic decision, defendant is precluded

from arguing on appeal the trial court should have severed the charges <u>sua sponte</u>.

B.    <u>Jury Instructions.</u>

Defendant argues critical errors and omissions in the jury instructions deprived him of due process and a fair trial.  Specifically, he argues the trial court:  (1) failed to orally define "knowledge" for the jury; and (2) erred by instructing the jury on grading enhancements for robbery that were not included in the indictment.  Based on these arguments, defendant seeks reversal of his convictions on counts two through ten, and a remand for a new trial on those charges.

We begin with the trial court's failure to orally define "knowledge" in its instructions for counts two through ten.  While instructing the jury on count two, first-degree robbery, for which knowledge is a mens rea element, <u>see</u> <u>State v. Sewell</u>, 127 N.J. 133, 148-50 (1992) (State must prove "knowledge" as the requisite mental state for the injury/force element of robbery), the trial court stated, "the State must also prove, beyond a reasonable doubt, that while in the course of committing the theft, the defendant knowingly inflicted bodily injury or used force upon another.  Again, I've already defined knowledge for you, so

I will skip to – I will skip that particular area." However, the trial court had not previously defined "knowledge" in its oral instructions.

The court appears to have been referring to its instructions for count one, attempted murder. That offense, however, does not include knowledge as a mens rea element, see N.J.S.A. 2C:11-3(a)(1) ("criminal homicide constitutes murder when . . . [t]he actor purposely causes death or serious bodily injury resulting in death . . . .") and N.J.S.A. 2C:5-1(a)(1) (defining attempt as "[p]urposely engag[ing] in conduct which would constitute the crime if the attendant circumstances were as a reasonable person would believe them to be . . . ."). Thus, the court's instructions for count one did not define "knowledge."

For the eight charges addressed by the court in its oral instructions after the robbery charge, counts three through ten, each of which has knowledge as a mens rea element, the trial court similarly instructed the jury that it had previously defined "knowledge" and did not provide an oral definition of "knowledge" to the jury. The court, therefore, never defined "knowledge" in its oral instructions to the jury.

The written jury instructions did contain a definition of "knowledge." The court, however, did not instruct the jurors to read the written instructions. Instead, the court instructed the jurors as follows: "You will be given two copies

19

of the jury instructions to take in with you when you start your deliberations. That's for your consultation. You do not – you do not need to read them if you don't think you need to read them."

Because defendant did not object to the jury instructions, we review the record for plain error.

> As applied to a jury instruction, plain error requires demonstration of "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)).]

The mere possibility of an unjust result is not enough to warrant reversal of a conviction. State v. Jordan, 147 N.J. 409, 422 (1997). Plain error is a "'high bar,' . . . requiring reversal only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Trinidad, 241 N.J. 425, 445 (2020) (first quoting State v. Santamaria, 236 N.J. 390, 404 (2019) and the quoting State v. Macon, 57 N.J. 325, 336 (1971)). "The error must be considered in light of the entire charge and must be evaluated in light 'of the overall strength

20

of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting Chapland, 187 N.J. at 289).

It is well-settled that "[a]ccurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial." State v. Concepcion, 111 N.J. 373, 379 (1988). "[W]e must read the charge as a whole." State v. Townsend, 186 N.J. 473, 499 (2006). "[T]he prejudicial effect of an omitted instruction must be evaluated in light of the totality of the circumstances including all the instructions to the jury, [and] the arguments of counsel." Ibid. (alteration in original) (quoting State v. Marshall, 123 N.J. 1, 145 (1991)). A defendant is entitled to a charge that is "accurate and that does not, on the whole, contain prejudicial error." State v. Labrutto, 114 N.J. 187, 204 (1989) (quoting State v. Thompson, 59 N.J. 396, 411 (1971)). "The test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)).

We addressed a court's failure to orally instruct a jury on the definition of the mens rea elements of charged crimes in State v. Lindsey, 245 N.J. Super. 466 (App. Div. 1991). There, the defendant was charged with three counts. Id. at 467. At the close of the trial, the judge instructed the jury orally. Id. at 470.

21

With respect to the mens rea element of the charged crimes, the court said to the jurors:

> All through the criminal law the words purposely and knowingly and recklessly are used because in order for a person to be guilty of a crime, they have to have a certain mental state, a certain mental attitude. They have to have a purpose or have to be reckless in what they are doing. They have to know what they are doing, but not actually intend a specific result that finally comes about.
>
> I'm going to give you those definitions as well in writing because, frankly, I find them incomprehensible when they are just spoken to you. And so you'll have them before you. But essentially, it's a – the highest degree of mental purpose and then a little less, then a little less.
>
> [Id. at 472.]

The court then orally gave the jury three examples involving the breaking of a pencil to illustrate purposeful, knowing, and reckless behavior. Id. at 472-73. The court ended its discussion of mens rea by stating, "[y]ou read it. And the law will tell you precisely what it means. Perhaps you'll explain it to me." Id. at 473.

Although the court gave the jury written instructions defining the mens rea elements of the charged crimes, it did not read those instructions to the jurors. Ibid. Nor did the court instruct the jurors that they each must read the

22

written instructions, or instruct the foreperson to read the written instructions to the jurors. Id. at 474. Defendant did not object to the oral instructions concerning the mens rea elements of the charged crimes. Id. at 473.

After the jury convicted defendant of all charges, he appealed, arguing the jury instructions were so inadequate as to constitute plain error. Id. at 467. We agreed, explaining:

> We find the oral instructions to the jury totally inadequate in the circumstances and "plain error" requiring a new trial. At the minimum, the entire instructions should be read to the jury. We cannot assume that each juror will independently read a written instruction or that a foreperson will read it to the entire jury in an objective fashion, as a judge would do. In this case, the jurors were not even specifically instructed to each read the instruction or to listen carefully while the foreperson read it. Nor will we even assume that each juror was sufficiently literate to read and comprehend the . . . instruction[s].
>
> [Id. at 474.]

We noted the long-standing holding that "[s]ince 'a jury may not even have the luxury of the availability of a dictionary during its deliberations,' a 'faithful performance of the court's duty of expounding law for the jury's guidance and instruction requires a plain and clear exposition of the issues.'" Id. at 475 (quoting State v. Green, 86 N.J. 281, 288 (1981)). We continued, "[t]hese responsibilities of the trial judge in orally instructing the jury have been most

23

recently revisited by our Supreme Cout in State v. Martin, 119 N.J. 2, 18 (1990), and [Concepcion, 111 N.J. at 379]." Ibid. "Our review of the extant authorities discloses a strong view that the judge should read all instructions to the jurors, not rely on jurors to read them, or the foreperson to recite them to the jury." Id. at 476. Concluding the instructions were fundamentally flawed, we reversed the defendant's convictions. Id. at 477-78.

We applied these principles more recently in State v. Kille, 471 N.J. Super. 633 (App. Div. 2022). There, the defendant was convicted of three charges, including the first-degree aggravated manslaughter of a man he shot in a dispute over a cellphone. Id. at 637-39. Although not raised as an objection at trial, id. at 641, defendant argued on appeal that while the court's written instructions contained the model jury charge instruction regarding an inference the jury may draw with respect to whether he had a valid permit to possess a handgun, the court eliminated this portion of the charge from its oral instructions to the jury, id. at 643. Reyling on our holding in Lindsey, defendant argued the omission of this crucial element of the written instructions from the oral instructions given to the jury denied him due process and a fair trial. Ibid.

We agreed. Id. at 645-46. In our analysis, we noted the Supreme Court had adopted an amendment to Rule 1:1-8 after our decision in Lindsey to

require, with a limited exception, submission of written instructions to the jury, where the practice had previously been discretionary. Id. at 644. We held

> nothing in the current Rule suggests a judge is relieved of orally conveying the contents of the charges to jurors. Indeed, since adoption of the revised Rule, the Court has reiterated the importance of providing oral jury instructions. In State v. Mohammed, the Court considered "the proper procedures a trial court should follow when faced with an allegation that a juror was inattentive during part of the trial," including the final jury charge. 226 N.J. 71, 74-75 (2016). The Court rejected "the trial judge's suggestion that the written instruction option in Rule 1:8-8 might cure a deficiency in the oral instruction." Id. at 88. Finding, "written instructions alone are insufficient to cure the juror's inattention and the resulting prejudice," ibid. (citing Lindsey, 245 N.J. Super. at 473-74), the Court held "copies distributed under the Rule were not a substitute for oral instructions or individual voir dire to determine whether a juror was alert and attentive," id. at 89.
>
> [Id. at 645.]

We also observed that whether reversal was required was

> a much closer question than in Lindsey because the judge's oral instructions . . . were not erroneous or inadequate; they simply omitted any guidance on how evidence adduced at trial could be used by jurors in deciding if the State carried its burden of proof on an essential element of the crime.
>
> [Ibid.]

Yet, we concluded failing to instruct the jury that it may draw an inference defendant did not have a valid handgun permit based on a detective's affidavit if "appropriate to do so under all the facts and circumstances," as stated in the model instructions, and instead permitting the jury in the absence of that instruction to presume he did not have a valid permit based on the detective's affidavit, "is critically connected to defendant's due process rights," warranting reversal. Id. at 645-46.

Here, as was the case in Lindsey, the trial court failed to provide the jury with an oral instruction concerning the definition of the mens rea element of counts two through ten. This failure was critically connected to defendant's due process rights, given the State's obligation to prove every element of each crime charged to obtain a conviction. As we held in Lindsey, we cannot assume the jury read the written definition of "knowing," or that the foreperson read the written instructions to the jury. This is particularly true, given the trial court's instruction to the jury with respect to the written instructions that "you do not need to read them if you don't think you need to read them" and the absence of an instruction to the foreperson to read the written instructions to the jurors.

We are not persuaded by the State's argument that reversal of defendant's convictions on counts two through ten is not warranted because the trial court

26

read to the jury snippets from the portion of the model jury charges that contains the definition of "knowledge." We have reviewed the court's comments and find nowhere in them the complete definition of "knowledge" set forth in the model charges. Far from providing the jurors with a complete and accurate definition of "knowing," the snippets, disconnected from the remainder of the model charges and delivered sporadically, had the potential to confuse the jurors and cloud the definition of a critical element of the charges against defendant in counts two through ten.

We are, therefore, constrained to reverse defendant's convictions on counts two through ten. In light of this holding, we need not address defendant's arguments with respect to sentencing on those convictions. We turn, however, to a sentencing issue raised in supplemental briefing by both parties following issuance of the opinion in Erlinger.

C.    Sentencing on Attempted Murder Conviction.

As discussed above, defendant was sentenced to a discretionary extended term of imprisonment on his attempted murder conviction pursuant to N.J.S.A. 2C:44-3(a). That sentence was imposed after the court found the State established each of the elements of the extended-term statute. During the pendency of this appeal, the United States Supreme Court in Erlinger held that

A-1164-21

"the Fifth and Sixth Amendments generally guarantee a defendant the right to have a unanimous jury find beyond a reasonable doubt any fact that increases his exposure to punishment." 602 U.S. at 828. The Court further held, "[v]irtually 'any fact' that 'increase[s] the prescribed range of penalties to which a criminal defendant is exposed' must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)." Id. at 834 (second alteration in original) (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)).

We recently held that in light of Erlinger, the holding in State v. Pierce, 188 N.J. 155 (2006), is abrogated and "a unanimous jury must find beyond a reasonable doubt that all . . . of the [N.J.S.A. 2C:44-3(a)] factual predicates are present, or the defendant must admit these predicates as part of a knowing and voluntary waiver of the right to a jury trial with respect to extended-term eligibility." Carlton, ___ N.J. Super. at ___ (slip op. at 22-23). We further concluded that application of the holding in Erlinger to the persistent offender statute, N.J.S.A. 2C:44-3, applies retroactively to pipeline cases. Id. at ___ (slip op. at 20); see also Griffith v. Kentucky, 479 U.S. 314, 328 (1987) ("We therefore hold that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or

not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past.").

We also rejected the State's argument that the harmless constitutional error doctrine applies to the pipeline cases to which Erlinger is retroactively applied. Carlton, ___ N.J. Super. at ___ (slip op. at 40-45). We based that holding on "the Erlinger majority's unambiguous rejection of the notion that overwhelming evidence obviates the need to have a jury make the decision" that the elements of an extended-term statute have been met. Id. at ___ (slip op. at 33). We see no reason to depart from that holding, even where, as is the case here, the defendant effectively conceded that the elements of N.J.S.A. 2C:44-3(a) had been satisfied.

We therefore afford the holding in Erlinger pipeline retroactivity to defendant's direct appeal of his sentence for attempted murder. We vacate defendant's extended-term sentence for attempted murder and remand for resentencing consistent with Erlinger and Carlton. If the State seeks to impose an extended-term sentence on remand, the court shall, in the absence of a knowing waiver of defendant's right to a jury trial, hold a jury trial on the attempted murder charge limited to the question of whether defendant is a persistent offender. See N.J.S.A. 2C:44-3(a). The State shall have the burden

of proving, beyond a reasonable doubt, the required persistent offender elements. A jury shall determine whether defendant: was twenty-one years of age or older at the time of committing the crime; "has been previously convicted on at least two separate occasions of two crimes"; committed the earlier crimes "at different times"; was "at least [eighteen] years of age" when he committed the prior crimes; and that the latest of the prior convictions, or the last release from confinement, whichever is later, was "within [ten] years of the date of the crime for which the defendant is being sentenced." N.J.S.A. 2C:44-3(a).

Affirmed in part, reversed in part, vacated in part, and remanded for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION